**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JASON JAYCOX, | ) | |
| | ) | |
| Plaintiff(s), | ) | |
| | ) | |
| vs. | ) | Case No. 4:19-cv-02650 SRC |
| | ) | |
| TEREX CORPORATION, et al., | ) | |
| | ) | |
| Defendant(s). | ) | |

**Memorandum and Order**

Jason Jaycox fell from atop a horizontal grinder in October 2014, landing on his head. His fall resulted in severe and debilitating injuries to his spine and skull.  At the time, Jaycox did not know who was responsible for his injuries.  Nearly five years later, Jaycox brought a product-liability claim against the entities responsible for the defective grinder.  Although Defendant Continental Biomass Industries, Inc. manufactured and sold the grinder at issue, Defendant Terex USA, LLC bought almost all of Continental's assets and liabilities in an asset purchase agreement in 2015.  Defendants point the finger at each other, seeking to avoid liability for Jaycox's injuries through the complexities of corporate succession and their own asset purchase agreement.

## I.      Background

Jaycox worked as an operations manager at Hansen's Tree Service.  Doc. 94 at ¶ 8. While cleaning the horizontal grinder at the end of the day, Jaycox slipped and fell off the side of the grinder.  *Id.*  Jaycox alleges the grinder was defective and unsafe for its intended use because it did not include proper safety protections or sufficient warnings.  Doc. 122.  He asserts three counts against Defendants:  (1) strict liability; (2) negligence; and (3) breach of warranty.  *Id.*

Continental moves for summary judgment against Jaycox, claiming that in the asset purchase agreement Terex USA assumed sole liability for Jaycox's claims.  Doc. 71.  Terex USA and Terex Corporation move for summary judgment against Jaycox, arguing that Terex USA did not assume liability for injuries that preceded the 2015 asset purchase agreement.[1]  Doc. 76.  Jaycox moves for partial summary judgment against Terex USA to hold it liable for his damages, in addition to Continental.  Doc. 79.  The Court grants Jaycox's motion for partial summary judgment, Doc. 79, grants in part and denies in part Continental's motion for summary judgment, Doc. 71, and denies Terex's motion for summary judgment , Doc. 76.

## II.    Facts

Except as otherwise noted, the Court finds the following facts not genuinely in dispute in this case.  *See* Fed. R. Civ. P. 56(g).

### A.    Continental's grinder

In 2008, Continental sold a CBI Magnum Force 6800 horizontal grinder to Hansen's Tree Service, the same grinder that injured Jaycox.  Doc. 94 at ¶ 6.  Jaycox worked for Hansen's, and fell from the grinder while cleaning it in October 2014, resulting in serious bodily injuries.  *Id.*  Jaycox filed suit against Continental five years later, in September 2019.  Doc. 1; Doc. 94 at ¶ 9.  Jaycox alleges that Continental's grinder caused him severe and permanent injuries.  Doc. 1 at ¶ 27.  Continental did not know of Jaycox's injury until he filed suit.  Doc. 94 at ¶ 11; Doc. 97 at ¶ 21–22.

---

[1] Terex USA, LLC is a wholly-owned subsidiary of Terex Corporation.  Doc. 77 at 11.  Terex Corporation and Terex USA, LLC filed a joint motion for summary judgment [76], so the Court refers to these parties jointly as "Terex."  All references to "Terex USA" refer to Terex USA, LLC alone.

### B.      Asset purchase agreement

On April 21, 2015, Continental, Terex USA, and several other parties entered into an asset purchase agreement to buy "substantially all" of Continental's assets.  Doc. 97 at ¶ 1–6.  Continental sold certain assets and liabilities to Terex USA, including several "Assigned Contracts" from Continental with "Standard Warranty Terms and Conditions."  *Id.* at 4–5; Doc. 93-1 at 4–6, Schedule 1.1(a)(vii).

In a section titled "Assumed Liabilities," Terex USA agreed to assume "only those liabilities of the Company relating to the Business as set forth on the Balance Sheet . . ."  Doc. 97 at ¶ 7; Doc. 93-1 at 4, Article 1, Section 1.4.  This section also set forth a non-exhaustive list of Terex USA's assumed liabilities.  Doc. 93-1 at 4–5, Article 1, Section 1.4.  In section 1.4(b), Terex USA assumed "all liabilities and obligations arising under or relating to the Assigned Contracts, including warranty liabilities . . ."  *Id.*; Doc. 97 at ¶ 6.  Section 1.4(f) elaborated that:

> In addition to the foregoing, [Terex USA] expressly assumes all liabilities and obligations of [Continental] with respect to future occurrences of product liability and warranty claims whether such obligation or liability relates to machinery and equipment manufactured by [Continental] before or after the Closing Date.

Doc. 97 at ¶ 7; Doc. 93-1 at 4–5, Article 1, Section 1.4.  In the very next section, Terex USA denied assumption of several "Excluded Liabilities," including any potential third-party "claim arising out of the  matter forth in Schedule 1.5(c)[.]"  Doc. 97 at ¶ 8–9; Doc. 93-1 at 5, Article 1, Section 1.5.  Curiously, no "Schedule 1.5(c)" exists, and the parties dispute whether another schedule contains the information referenced in Section 1.5(c).  Doc. 93-1 at 79–80; Doc. 72 at 2; Doc. 97 at ¶¶ 11–12.

The asset purchase agreement also contains a choice-of-law provision, selecting Delaware law as the governing law for the agreement.  Doc. 97 at ¶ 15; Doc. 93-1 at 39, Article 14, Section 14.10.

### III.    Standard

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In ruling on a motion for summary judgment, the Court is required to view the evidence in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences drawn from the underlying facts.  *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir. 1987).  The moving party bears the initial burden of showing both the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); Fed. R. Civ. P. 56(a).

In response to the proponent's showing, the opponent's burden is to "come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)).  Self-serving, conclusory statements without support are insufficient to defeat summary judgment.  *Armour and Co., Inc. v. Inver Grove Heights*, 2 F.3d 276, 279 (8th Cir. 1993).  Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### IV.    Discussion

For the most part, the parties do not dispute the material facts for summary judgment.  Instead, the parties disagree on the meaning of certain language in the asset purchase agreement ("APA") and which of the Defendants are therefore liable for Jaycox's claims.  Continental and

4

Jaycox both argue that Terex USA expressly assumed liability for all *claims* occurring after the closing date of the APA, so Terex USA is liable for Jaycox's claims.  Docs. 71, 79.  Terex responds that it only assumed liability for *incidents* occurring after the APA closing date, so Continental is liable.  Doc. 76.  Relatedly, Continental asserts that because Terex USA assumed liability for Jaycox's claims in the APA, Continental cannot be liable for Jaycox's claims as a matter of law.  Doc. 71.  The parties also dispute which state's law governs, and the Court begins its analysis there.

> **A.    Governing law**

A federal court sitting in diversity applies the substantive law of the state in which the district court sits.  *Urban Hotel Dev. Co. v. President Dev. Co., L.C.*, 535 F.3d 874, 877 (8th Cir. 2008).  The obligation to apply state law extends to the forum state's choice-of-law principles. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Winter v. Novartis Pharm. Corp.*, 739 F.3d 405, 410 (8th Cir. 2014).  The Court applies Missouri's choice-of-law rules.  *See Stricker v. Union Planters Bank, N.A.*, 436 F.3d 875, 877 (8th Cir. 2006) ("In a diversity action, a district court sitting in Missouri follows Missouri's choice-of-law rules to determine applicable state law . . .").  Missouri courts apply the Restatement-of-Conflicts rules that require courts to make choice-of-law decisions on each particular issue at hand.  *See E. Prairie R-2 School Dist. v. U.S. Gypsum Co.*, 813 F. Supp. 1396, 1401 (E.D. Mo. 1993) ("[T]he laws of different states may be used to resolve different issues in a single case.") (citing Restatement (Second), Conflicts of Law §§6(2)(c), 145 comment d, 188 comment d (1971)).   This case raises two choice-of-law issues:  1) what law applies to determining liability as between Continental and Terex USA, i.e. what law governs interpretation of the APA, and 2) what law applies to determining who is liable to Jaycox, a tort victim who is a stranger to the APA.

### 1.      Interpretation of the APA

Jaycox argues that despite the APA's selection of Delaware law, Missouri law should apply instead.  Doc. 90 at 2 (citing *Ronnoco Coffee, LLC v. Westfeldt Brothers, Inc.*, 939 F.3d 914, 920 (8th Cir. 2019)).  For the reasons explained below, Delaware law applies to the APA.

Missouri generally enforces contractual choice-of-law provisions.  *Stone v. Crown Diversified Indus. Corp.*, 9 S.W.3d 659, 666 (Mo. Ct. App. 1999); *Sturgeon v. Allied Professionals Ins. Co.*, 344 S.W.3d 205, 210 (Mo. Ct. App. 2011); *see also Davis v. Citibank, N.A.*, 2015 WL 928117, at *2 (E.D. Mo. 2015) (applying parties' choice-of-law provision under Missouri law because resolution of the claim was "integrally related to interpretation of the contract").  Continental and Terex USA included a choice-of-law provision in the APA, selecting Delaware law.  Doc. 93-1 at 39, Article  14, Section 14.10.  Because determining liability here necessarily involves interpreting the APA, Delaware law governs this particular issue.  *See E. Prairie R-2 School Dist.*, 813 F. Supp. at 1401 ("[T]he laws of different states may be used to resolve different issues in a single case. Thus, although Missouri law should apply to determine whether or not [the defendant] is liable as a successor [corporation], contract choice of law provisions should apply to interpretation of the agreement itself.").

Jaycox claims that Missouri law should apply to the interpretation of the APA because no conflict exists between the laws of Missouri and Delaware, therefore the choice-of-law analysis is unnecessary.  Jaycox cites *Ronnoco Coffee*, which recently held that courts should avoid choice-of-law questions when the laws of the competing jurisdictions would "produce the same result on the particular issue presented."  939 F.3d at 920.  But *Ronnoco Coffee* did not involve a contractual choice-of-law provision, unlike here, where the APA dictates the governing law.  *See id.*  Continental and Terex USA were entitled to select the law governing liability as between

6

themselves, though their choice-of-law provision may not govern tort liability to third parties. *Osborn v. Prime Tanning Corp.*, 2011 WL 13291159, at *5 (W.D. Mo. 2011).  Here, the APA set out the applicable law for purposes of contract interpretation; Delaware law therefore governs for that limited purpose.  *E. Prairie R-2 School Dist.*, 813 F. Supp. at 1401.

### 2.      Tort liability to third parties

The parties also dispute the governing law on the issue of which party is liable for Jaycox's claims, but the Court need not delve into a choice-of-law analysis on this issue.  The rules for corporate successor liability are the same in both Missouri and Delaware.  *See Med. Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc.*, 336 F.3d 801, 803 (8th Cir. 2003) ("The general rule in Missouri is that when all of the assets of a corporation are sold or transferred the transferee is not liable for the transferor's debts and liabilities." (citation omitted)); *Magnolia's at Bethany, LLC v. Artesian Consulting Engineers, Inc.*, 2011 WL 4826106, *2 (Del. Super. 2011) ("In Delaware when one company sells or otherwise transfers all of its assets to another company, the buyer generally is not responsible for the seller's liabilities, including claims arising out of the seller's tortuous [sic] conduct."); *see also Ronnoco Coffee,* LLC, 939 F.3d at 920 ("The well-settled general rule, adopted in virtually every State, is that "where one company sells or otherwise transfers all its assets to another company, the latter is not liable for the debts and liabilities of the transferor.").  Both Missouri and Delaware have the same exception to successor nonliability for purchasers who expressly or impliedly agree to assume the debts or liabilities of the seller. *See Gorsuch v. Formtek Metal Forming, Inc.*, 803 F.Supp.2d 1016, 1021–22 (E.D. Mo. 2011); *Magnolia's at Bethany, LLC*, 2011 WL 4826106, at *2.  The Court therefore declines to undergo a choice-of-law analysis on this issue.

B.      The asset purchase agreement

Jaycox asserts that Terex USA expressly assumed liability for all product-liability and warranty claims made after the closing date of the APA.  Doc. 80 at 2.  Continental takes the same position. Doc. 72 at 5.  Terex disagrees, arguing that under the clear terms of the APA Terex USA only assumed liability for future incidents giving rise to liability.  Doc. 93 at 3.  The Court turns to interpretation of the contract.

In Delaware, contract interpretation is a question of law.  *Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1030 (Del. Ch. 2006) ("Under Delaware law, the proper interpretation of language in a contract is a question of law.").  "Delaware adheres to the 'objective' theory of contracts, i.e. a contract's construction should be that which would be understood by an objective, reasonable third party." *Osborne ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010).  Courts must construe contracts as a whole, giving effect to all of the contract's provisions and interpreting them "in a way that does not render any provisions illusory or meaningless." *GMG Cap. Invs., LLC v. Athenian Venture Partners I.L.P.*, 36 A.3d 776, 779 (Del. 2012) ("When interpreting a contract, the Court will give priority to the parties' intentions as reflected in the four corners of the agreement.").

Courts must give contracts their "evident meaning" when the language is "plain and unambiguous." *Allied Capital Corp.*, 910 A.2d at 1030.  Only if the language is "susceptible of more than one reasonable interpretation" should courts consider parol evidence.  *Id.*  Mere disagreement as to a contract's meaning does not render it susceptible to multiple interpretations. *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).  "The true test is not what the parties to the contract intended it to mean but what a reasonable person in the position of the parties would have thought it meant." *Id.*

8

### 1.      The disputed APA provision

The parties dispute the meaning of the following provision in Article 1, Section 1.4(f) of

the APA:

> In addition to the foregoing, Buyer expressly assumes all liabilities and obligations
> of the Business **with respect to future occurrences of product liability and**
> **warranty claims** whether such obligation or liability relates to machinery and
> equipment manufactured and sold by the Business before or after the Closing Date.

Doc. 93-1 at 4–5 (emphasis added).

Jaycox posits that "future occurrences of product liability and warranty claims" refers to

future actions for product-liability and breach-of-warranty rather than future incidents giving rise

to such claims.  *Id.* at 4.  Because Jaycox filed suit after the closing date of the APA, this was a

"future occurrence" of "product liability and warranty claims," so Terex USA assumed liability

for his claims.  *Id.*

Jaycox analogizes this situation to a "claims made" policy in the insurance context, where

the sole consideration is when the insurer receives *notice* of the claim rather than when the

underlying *incident took place*.  *Id.* at 5 (citing *Landry v. Intermed Ins. Co.*, 292 S.W.3d 352,

355–56 (Mo. App. 2009) (describing the limited focus of a claims-made policy)).  Jaycox filed

suit in September 2019, long after the APA closing date.  *Id.*  According to Jaycox, that his

injury happened before the APA closing date is immaterial, because Terex USA assumed

liability for all product-liability and warranty claims that "occur" after the APA closing.  *Id.*

Terex argues that "future occurrence" refers to the underlying event that gives rise to a

product-liability or warranty claim.  Doc. 93 at 3.  Terex insists that the common and ordinary

definition of the word "occurrence," particularly in the personal injury context, means the event

giving rise to a claim.  *Id.* (citing *McCoy v. Draine*, 1991 Del. Super. LEXIS 54, *6 (Del. Super.

1991)).  Terex observes that Black's Law Dictionary defines "occurrence" as:  "[s]omething that

happens or takes place, specif., an accident, event or continuing condition that results in personal injury or property damage that is neither expected nor intended from the standpoint of an insured party."  *Occurrence*, Black's Law Dictionary (11th ed. 2019).  And Federal Rule of Civil Procedure 15(c)(1)(B) uses the word "occurrence" when referring to claims that "arose out of the conduct, transaction, or *occurrence* set out . . . in the original pleading."  Fed. R. Civ. P. 15(c)(1)(B) (emphasis added).

Terex points to other provisions of the APA to support this interpretation.  Doc. 93 at 4. For example, in Schedule 4.12(c), Continental disclosed one of its insurance policies: "[Continental] maintains insurance as set forth in Schedule 4.12(c) and its general liability policy is an 'occurrence' based policy."  Doc. 93-1 at 82.  Terex argues that Continental's maintenance of an "occurrence based policy," as opposed to a claims-made policy, demonstrates that the parties intended for Continental to retain sole liability for incidents preceding the APA closing date.  Doc. 93 at 4.

Terex points to provisions within the APA that use the words "occur" or "occurrence" in relation to a claim or cause of action.  *Id.* at 5.  In Terex's examples, the term always refers to events that give rise to a claim.  *See, e.g.,* Doc. 93-1 at 14 ("[N]o event has occurred which, with the passage of time or the giving of notice or otherwise would result in a material default, breach or event of noncompliance . . . under the lease."); *id.* at 15 ("[N]o condition exists or event has occurred that would constitute a default under any such License."); *id.* at 18 ("[N]o event or circumstance has occurred that, with or without the lapse of time, or the giving of notice, or both, would constitute an event of default under any Material Contract.").  Terex concludes that "future occurrence" in Article 1, Section 1.4(f) can refer only to the date of an underlying incident rather than the date of a claim.  Doc. 93 at 5–6.

## 2.      Threshold matters for interpreting Section 1.4(f)

At the outset, the Court looks to the APA's provision on textual construction.  Doc. 93-1 at 37–38, Article 14, Section 14.5(i).  That provision specifies:  "if an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties hereto and *no presumption or burden of proof will arise* favoring or disfavoring any person by virtue of the authorship of any of the provisions of this agreement."  *See id.* (emphasis added).  Therefore, the Court does not construe the APA against any of the parties to it.

The APA painstakingly defines many terms but does not define any of the key terms in Section 1.4(f).  Appendix A of the APA contains a list of definitions, but it does not include definitions for the words "future," "occurrences," "future occurrences," "product liability," or "claims."  Doc. 93-1 at 43–51, Appendix A.  Because the APA does not define the key terms in Section 1.4(f), the Court applies their common and ordinary meanings, according to what a "reasonable person in the position of the parties" would understand them to mean.  *Rhone-Poulenc Basic Chems. Co.*, 616 A.2d at 1196.

Notably, Appendix A does define "Environmental Claim" as: "any notice, violation, suit, injunction, order, consent decree, penalty, fine, lien or proceeding arising (i) pursuant to a violation of or liability under any Environmental Law . . ."  *Id.* at 46.  This definition reflects the parties' intent that a) "claims" modifies its antecedent "environmental," and b) environmental claims include both notices and proceedings, as opposed to the happening of underlying events giving rise to such a claim.

Before interpreting the phrase "future occurrences of product liability and warranty claims," the Court also looks to the rest of Section 1.4, titled "Assumed Liabilities."  Doc. 93-1 at 4.  Section 1.4 opens with:  "the Company agrees to assign and transfer to the Buyer and the

Buyer agrees to assume only those liabilities of the Company relating to the Business as set forth on the Balance Sheet (the "Assumed Liabilities") including, but not limited to . . ." *Id.* This introductory clause limits "Assumed Liabilities" only to those a) relating to the Business (a defined term), and b) set forth on the Balance Sheet (an undefined term). *See* Doc. 93-1 at 43–51, Appendix A. Section 1.4 goes on to recite the assumed liabilities, lettered (a) through (g), which, based on the opening line of Section 1.4, presumably all appeared on the balance sheet. *See id.* at 4–5.

Unlike the other subparagraphs in Section 1.4, Section 1.4(f) has a second paragraph, seemingly unrelated to the first paragraph. *Id.* at 5. The second paragraph of Section 1.4(f) contains the assumption of liability for "future occurrences of product liability and warranty claims." *Id.* For the sake of distinguishing the two parts of Section 1.4(f), the Court refers to this second paragraph as the "claims clause."

The claims clause starts with the phrase "*[i]n addition to the foregoing . . .*" *Id.* Meanwhile, Section 1.4(g) cross-references items (a) through (e), demonstrating that the drafters knew how to draft more-limiting language than "[i]n addition to the foregoing" to connect the claims clause of Section 1.4(f) to the rest of the Section 1.4. *See id.* The "[i]n addition to the foregoing" language therefore demonstrates that all of the terms in Section 1.4 preceding the provision do not constrain this provision's assumption of liability. *See id.* Thus, Section 1.4's reference to the transfer of "only those liabilities of the Company relating to the Business as set forth on the Balance Sheet" does not limit the scope of Terex USA's assumption of liabilities in the second paragraph of Section 1.4(f). *See id.*

The parties do not contend that future product-liability and warranty claims would normally appear on a company's balance sheet when, as here, the company had no notice of a

claim against it.  *See* Doc. 72 at 6; Doc. 80 at 5.  But because this provision in Section 1.4(f) is "[i]n addition to the foregoing," the assumed liabilities in the claims clause need not appear on the company balance sheet.  *See id.*  With this in mind, the Court turns to interpreting the claims clause of section 1.4(f).

### 3.    Claims-clause interpretation

In the claims clause of Section 1.4(f), Terex USA expressly assumed "all liabilities and obligations of the Business with respect to **future occurrences of product liability and warranty claims** . . ." *Id.* (emphasis added).  To understand this clause, the Court first examines whether "claims" modifies both "product liability" and "warranty."  *See id.*  In other words, does the key phrase really mean "future occurrences of product liability [claims] and warranty claims"?  *See id.*  The series-qualifier canon of construction assists with the answer here.  *See* Antonin Scalia & Bryan A. Garner, *Reading the Law: The Interpretation of Legal Texts* 147–151 (1st ed. 2012).

The series-qualifier canon states that "[w]hen there is a straightforward, parallel construction that involves all nouns or verbs in a series, a prepositive or postpositive modifier normally applies to the entire series."  *See id.* at 147.  Here, the postpositive modifier—"claims"—applies to both "product liability" and "warranty" because they form a series of nouns separated by "and."  *See id.*  If the drafters had wished for "claims" to only modify "warranty," they could have inserted a determiner (e.g. "of") before the second element in the series:  "future occurrences of product liability and [of] warranty claims."  *See id.*  Therefore, "claims" modifies both "product liability" and "warranty."  Doc. 93-1 at 5.

Next, the Court examines the common and ordinary meanings of the key terms: "claims," "product liability," and "occurrences."  Black's Law Dictionary defines "claim" as "[a]

statement that something yet to be proved is true" and "[t]he assertion of an existing right; any right to payment or to an equitable remedy, even if contingent or provisional." *Claim*, <u>Black's Law Dictionary</u>, *supra*.  "Product liability" (or "products liability") means "[a] manufacturer's or seller's tort liability for any damages or injuries suffered by a buyer, user, or bystander as a result of a defective product." *Products Liability*, <u>Black's Law Dictionary</u>, *supra*.  Combining these definitions, a "product-liability claim" is a plaintiff's assertion of a right against another party for damages suffered due to a defective product; it is not the underlying event that grants the plaintiff their right to relief.  *See id.*  And as Terex discussed, "occurrence" means "[s]omething that happens or takes place, specif., an accident, event or continuing condition that results in personal injury or property damage that is neither expected nor intended from the standpoint of an insured party." *Occurrence*, <u>Black's Law Dictionary</u>, *supra*.  Therefore, "future occurrences of [something]" refers to some kind of event that happens in the future.  *See id.*  The question then becomes whether "future occurrences" modifies "product liability" or "product-liability . . . claims."

The Court now analyzes the meaning of the claims clause of Section 1.4(f), in light of the definitions of the relevant terms and the syntax of the phrase, as established above.  Terex asserts that "occurrence" must refer to an underlying event giving rise to a claim.  Doc. 93 at 5–7.  This might be true if the phrase simply read "future occurrences of product liability." *See* Doc. 93-1 at 5.  But because "claims" modifies both "product liability" and "warranty," the phrase means: "future occurrences of product liability [claims] and warranty claims." *See* Scalia & Garner, *supra*, at 147–151.  And since "product liability claims" and "warranty claims" each refer to a plaintiff's assertion of a particular right, rather than an underlying event giving rise to the

14

plaintiff's right, the entire phrase means that Terex USA assumed liability for *all product-liability claims asserted in the future and all warranty claims asserted in the future*.

The Court cannot read the word "occurrences" in isolation from the rest of the phrase, as Terex urges, because "future occurrences of" describes the subject of the phrase:  "product liability [claims] and warranty claims."  *See id.*  The words "future occurrences of" limit the provision to claims that happen or "occur" in the future.  *See id.*  In its most basic form, the phrase states that Terex USA assumed liability for "future occurrences of . . . claims."  *See id.*  The word "of" indicates that "claims" are the type of "future occurrences" at issue, not the underlying events themselves.  *See id.*

Terex urges that this interpretation renders the word "occurrences" superfluous, because the Court is actually interpreting the phrase to read:  "future . . . product liability and warranty claims."  Doc. 93 at 6–7.  When interpreting a contract,  "each word should be given meaning and effect by the court," *NAMA Holdings, LLC v. World Mkt. Ctr. Venture, LLC*, 948 A.2d 411, 419 (Del. Ch. 2007), *aff'd*, 945 A.2d 594 (Del. 2008), and courts must give contract language its "evident meaning" when the terms are clear and unambiguous.  *Allied Capital Corp.*, 910 A.2d at 1030.  The Court's interpretation gives meaning and effect to every word in the phrase, as "occurrences" emphasizes that "claims" are discrete events that must "happen or take place" in the future.  *See Occurrence*, Black's Law Dictionary, *supra*; Doc. 104 at 3.  Reading the phrase without the term "occurrences" would create uncertainty as to which claims the provision covers—claims that arise in the future, ongoing claims dating from before the APA closing, or both.  *See* Doc. 93-1 at 5.  Inclusion of the term "occurrence" creates specificity by restricting the scope of the provision to claims which potential plaintiffs might assert after the APA closing. *See id.*

15

In contrast, Terex's interpretation would require the Court to interpret the phrase as "future occurrences [giving rise to] product liability and warranty claims," or "future occurrences of product liability and warranty [incidents]." *See* Doc. 104 at 3.   Terex would either have the Court replace the word "of" with "giving rise to," or replace the word "claims" with "incidents." *See id.* Terex USA's interpretation departs from the text.  Yet the plain meaning of the claims clause establishes that Terex USA expressly assumed liability for all product-liability and warranty claims asserted after the APA closing.

### 4.      Additional context from the APA

The Court next examines the rest of the APA to determine if additional context confirms the Court's interpretation of the claims clause in Section 1.4(f).  The Court first looks to the remainder of the claims clause in Section 1.4(f).  *See* Doc. 93-1 at 5.

The end of the claims clause states that Terex USA assumes liability for future claims "whether such obligation or liability relates to machinery and equipment manufactured and sold by the Business before or after the Closing Date."  *See id.*  This phrase is consistent with the Court's above interpretation; it demonstrates that Terex USA intended, at the very least, to assume liability related to machinery and equipment that Continental sold before the APA closing.  *See id.*  If Terex USA assumed liability for product-liability and warranty claims arising from Continental's machinery and equipment sold before the APA closing, it could also assume liability for incidents predating the APA closing from that same machinery and equipment.  *See id.*  Likewise, if Terex USA only assumed liability for machinery and equipment that it sold after the APA closing, Terex USA would only assume the accompanying liability; the events giving rise to such liability would, by definition, only occur post-closing.  *See id.*

The very next section in the APA, Section 1.5, is also consistent with the Court's interpretation of Section 1.4(f). *See id.* Section 1.5, titled "Excluded Liabilities," states that "[e]xcept to the extent expressly assumed by Buyer pursuant to Section 1.4, Buyer shall not assume or be liable for any of the following liabilities or obligations of sellers (the "Excluded Liabilities") . . ." *Id.* In Section 1.5(c), Terex USA expressly *denied* assumption of "any liabilities or obligations concerning any claim related to or arising out of the matter set forth in Schedule 1.5(c) of the Disclosure Schedule," though no schedule identified as Schedule 1.5(c) exists in the Disclosure Schedule. *Id.* at 5, 79–80.

Meanwhile, Schedule 4.12(c), titled "Liabilities," reported an "accident resulting in a fatality involving a 15 year old equipment unit manufactured by CBI." *Id.* at 82, Schedule 4.12(c). Continental had already informed its general liability insurer regarding that accident, but "no claim [had] been made against CBI" as of the APA closing date. *Id.* Schedule 4.12(c) further states that "[t]he Company maintains insurance as set forth in Schedule 4.12(c) and its general liability policy is an 'occurrence' based policy." *Id.* Continental represents that the parties negotiated that Continental would retain liability for a specific prior accident, and Continental claims that the parties intended for the fatal accident in Schedule 4.12(c) to be the excluded liability identified in Section 1.5(c). Doc. 72 at 2.

Section 1.5(c) and Schedule 4.12(c) each separately disclose incidents relating to Continental, where the plaintiffs had not yet asserted a claim. *See* Doc. 93-1 at 5, 82. But under Terex USA's interpretation of the claims clause, the parties would not have had to disclose any accident that preceded the closing, because in Terex's view, it only assumed liability for events happening *after* the closing. *See id.* at 5. But under the Court's interpretation, the parties' disclosure of a *prior event* that could give rise to a *future claim* makes sense because Terex USA

17

expressly assumed liability for all product-liability and warranty claims occurring after the APA closing date, regardless of when the underlying event happened. *See id.* The only reason for the parties to make these disclosures is if the claims clause otherwise shifts liability from Continental to Terex USA for claims asserted post-closing. *See id.* Terex's interpretation of the claims clause therefore renders the parties' disclosure of this pre-closing incident unnecessary. *See id.*

Of course, the parties dispute whether Section 1.5(c) and Schedule 4.12(c) refer to the same incident, raising a potential ambiguity in the APA as to whether Terex USA assumed liability for the incident set out in Schedule 4.12(c). Doc. 72 at 2; Doc. 96 at 10–11. To determine what liability Terex USA excluded through Section 1.5(c), the Court would have to interpret a reference to a schedule that does not exist. *See* Doc. 93-1 at 5, 79–80. Continental highlights this ambiguity in its brief and submits the parol evidence of deposition testimony from Continental's corporate representative declaring that the liability in Schedule 4.12(c) was supposed to be excluded under Section 1.5(c). Doc. 72 at 2; Ragnarsson Dep. 138:2–139:7, 176:19–21. Determining whether Terex USA assumed liability for the incident in Schedule 4.12(c) is unnecessary to the Court's interpretation of Section 1.4(f), so the Court need not resolve whether these two APA provisions refer to the same incident.

Continental's disclosure of its insurance policy in Schedule 4.12(c) as an "occurrence based" policy is also consistent with the Court's interpretation of the claims clause. An "occurrence based" policy is a common form of insurance that covers an entity for incidents that happen during the policy period, even if the resulting claim comes later. *See, e.g., St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 535 n.3 (1978) (explaining the nature of an "occurrence based" policy verses a "claims made" policy); *Hoechst Celanese Corp. v. Certain Underwriters at Lloyd's London*, 656 A.2d 1094, 1095 (Del. 1995). As Continental points out,

Continental's maintenance of an "occurrence based" policy for a period preceding the APA closing does not mean that Continental intended to retain liability for incidents occurring before the APA closing; the disclosure simply means that Continental had insurance coverage for a pre-closing claim that it retained.  *See* Doc. 93-1 at 82; Doc. 105 at 7–8.

Terex asserts that "the exclusion of [Continental's] liability policies [from Assumed Assets] would not be rationally consistent with" Continental's interpretation of the APA.  Doc. 77 at 6–7.  Schedule 1.3(b) specifies that Continental retained ownership of its insurance policies, including the "occurrence based" policy in Schedule 4.12(c).  Doc. 93-1 at 79, 82.  But Continental's retention of these policies does not mean that Continental also retained liabilities for any future claims against it.  *See id.*  As Continental explains, Continental already paid for the protections under the insurance policies, and "as evidenced by this lawsuit, CBI has no control over whether a prospective plaintiff might target it in a lawsuit."  Doc. 105 at 7–8.  Even though Continental intended for Terex USA to assume liability for all future claims after the APA closing date, Continental still had ample reason to retain insurance coverage for incidents preceding the APA closing date.  *See id.*

The context of the APA as a whole confirms the Court's interpretation of the claims clause.  Under the claims clause, Terex clearly and unambiguously assumed liability for all product-liability and warranty claims asserted after closing.

### 5.    Terex's other arguments

Terex makes three additional arguments for its interpretation of the claims clause.  First, Terex argues that Jaycox's interpretation leads to absurd results, because it means that under the APA it assumed an uncertain amount of liability, which "no reasonable person would have accepted when entering the contract."  Doc. 93 at 9–10 (quoting *Kemp*, 991 A.2d at 1160).

19

Terex claims that this makes Terex USA's liability "wholly dependent on when an unknown third-party chooses to assert a claim." *Id.* at 9.  Terex avers further that Continental and Jaycox's interpretation renders the provision ambiguous about what event triggers Terex USA's liability: the filing of a lawsuit, the receipt of a demand letter, or general notice of an incident.  *Id.*

The Court finds this argument unpersuasive.  As Jaycox explains in his reply, Doc. 104 at 4, "claims-made" provisions are common contract terms for allocating risk among parties, particularly in the insurance context.  *See Hoechst Celanese Corp.*, 656 A.2d at 1095.  Even under Terex's own interpretation of the provision, the extent of Terex USA's liability remains subject to the choices of unknown third parties who experience injuries and make claims because of equipment sold by Continental before the APA closing date.  *See* Doc. 93-1 at 4–5, Article 1, Section 1.4.  Terex USA's assumption of liability for claims filed after the APA closing is not a decision that "no reasonable person" would accept, so the interpretation does not produce an absurd result.  *See Kemp*, 991 A.2d at 1160.  Additionally, the Court need not determine what form of notice constitutes a "claim" under the APA, as Terex concedes that Jaycox asserted "product liability and warranty claims" against Continental and Terex USA.  Doc. 94 at 4.  *See Henry v. Phixios Holdings, Inc.*, 2017 WL 2928034, at *7 (Del. Ch. 2017) (declining to determine the legal effect of a contract provision when it would have no effect on the court's analysis).

Second, Terex argues that Jaycox's claims predated the APA closing date because Jaycox's "claim" accrued at the time of his injury.  Doc. 93 at 8–9 (citing *State ex rel. Old Dominion Freight Line, Inc. v. Dally*, 369 S.W.3d 773, 779 (Mo. App. S.D. 2012) ("A claim accrues when 'some damage [is] sustained and capable of ascertainment.'")).  But Terex's authority on this point does not define a "claim" in the context of contract interpretation; it

20

describes when the statute of limitations begins to run because the plaintiff is capable of bringing an action. *See Dally*, 369 S.W.3d at 779. A "claim" is "[a] statement that something yet to be proved is true" and "[t]he assertion of an existing right . . ." *Claim*, Black's Law Dictionary, *supra*. Thus, a "claim" exists when a plaintiff asserts a right against another party, not at the time of the underlying event. *See id.* A "reasonable person in the position of the parties" would understand the word "claims" in the APA to refer to the assertion of a right, not the date of accrual. *See Rhone-Poulenc Basic Chems. Co*, 616 A.2d at 1196.

Third, in a last-ditch effort, Terex argues that the Court should apply judicial estoppel to prevent Jaycox from arguing for his interpretation of the APA because Jaycox previously used the term "occurrence" to refer to the underlying incident in a legal brief. Doc. 93 at 10–12. This argument lacks merit. Judicial estoppel "protect[s] the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001) (internal citations omitted). Courts consider such factors as 1) a party taking a clearly inconsistent position with an earlier position, 2) the party successfully persuading a court to accept the earlier position, and 3) the party deriving an unfair advantage over the opposing party if not estopped. *Vacca v. Mo. Dep't. of Labor & Indus. Rels.*, 575 S.W.3d 223, 232–33 (Mo. banc. 2019) (citing *New Hampshire*, 532 U.S. at 749).

Here, none of these factors apply. Jaycox did not take a contrary position before, nor did he persuade the Court to accept a certain definition of "occurrence." Doc. 49 at 4. Jaycox did not derive an unfair advantage from his prior use of the term "occurrence" in his brief. *See id.* Jaycox may have used the term "occurrence" in his opposition to Terex USA's motion to dismiss, but Jaycox was not addressing the phrase "occurrences of product liability and warranty

claims" in the APA.  *Id.*  Jaycox did not even take a position on the meaning of the claims clause

in that brief.  *Id.*  That Jaycox used the term "occurrence" in an entirely different context in a

previous legal memorandum does not provide a basis for judicial estoppel.

   The Court holds that Terex USA expressly assumed liability for Jaycox's claims.  *See*

Doc. 93-1 at 4–5, Article 1, Section 1.4(f); *see also Gorsuch*, 803 F.Supp.2d at 1022; *Magnolia's*

*at Bethany, LLC*, 2011 WL 4826106 at *2.  Jaycox filed suit in September 2019, more than four

years after the APA closing date, and the lawsuit was Jaycox's first assertion of a claim.  Doc. 94

at ¶¶ 8–9.

   ### C.    **Transferor liability**

    Continental asserts that because it transferred its liability to Terex USA through the

APA, Continental as a matter of law has no liability to Jaycox.  Doc. 71 at ¶ 7.  Terex and Jaycox

disagree, arguing that Continental can still be liable even if Terex USA assumed liability for

Jaycox's claims.  Doc. 96 at 3–4; Doc. 98 at 3–5.  Terex argues that its contractual assumption of

liability would not prevent Continental from being liable for Jaycox's claims, citing *Tretter v.*

*Rapid American Corp.*, 514 F. Supp. 1344 (E.D. Mo. 1981).  Jaycox also argues that Continental

is jointly-and-severally liable for his injuries, citing *Realty Resource Inc. v. True Docugraphics,*

*Inc.*, 312 S.W.3d 393 (Mo. App. 2010) and *Roper Electric Co. v. Quality Castings, Inc.*, 60

S.W.3d 708 (Mo. App. 2001).

   As a threshold matter, the Court observes that Continental cites no authority for its

contention that Terex USA's liability relieves Continental of its tort liability as a matter of law.

Doc. 72, 105.  Continental spends much of its reply attempting to distinguish Jaycox and Terex's

cases, Doc. 105, but Continental presents no authority of its own to substantiate its argument that

it shed all legal liability for Jaycox's claims.  *See id*; Doc. 71 at ¶ 7.  Continental only cites to the

Missouri statute defining joint-and-several liability, Mo. Rev. Stat § 537.067, and a Missouri

case finding that joint-and-several liability applies when both defendants are negligent, *Hein v.*

*Oriental Gardens, Inc.*, 988 S.W.2d 632, 634 (Mo. App. W.D. 1999).  These citations do not aid

Continental here.

When a successor corporation expressly agrees to assume liabilities for the defective

products sold by its predecessor, the successor is liable in accordance with the terms of the

agreement.  *See Osborn*, 2011 WL 13291159, at \*7.  "As a general matter, contract law governs

the application of this exception" to the successor non-liability rule.  Restatement (Third) of

Torts: Prod. Liab. § 12 (1998).

Corporations cannot discharge liabilities for their torts against third parties through

contract.  *See* 15 Fletcher Cyc. Corp. § 7123 (2020) ("Although a sale of assets may allow an

injured plaintiff to proceed against the successor corporation, it does not vitiate the original

company's liability.").  Even if a successor assumes the tort liability of the predecessor through

an asset purchase agreement, a plaintiff may still bring a claim against the predecessor:  "[t]he

right of the injured party to elect to proceed against the defunct corporation, the successor

corporation, or both cannot be altered per se by the corporations, although the corporations can

regulate how such liability will be allocated among themselves."  *Id.*

Basic contract law dictates that "an initially obligated party cannot delegate his

responsibility by agreement with a third person."  *Husak v. Berkel, Inc.*, 341 A.2d 174, 179 (Pa.

1975); *see also* 15 Fletcher Cyc. Corp. § 7114 (when a successor expressly assumes the

predecessor's debts and liabilities, "[i]f the creditors of the old corporation assent to the change

of liability, there is a clear novation, and they may maintain an action against the new

corporation.").  *Husak* explained that the same principle applies to tort liabilities:  "[s]imilarly, in

torts, although a person or organization can indemnify itself by agreement with another party against damages arising from its actions, it still remains liable to the injured person. The plaintiff's action is considered apart from the agreement between the transferor and transferee of liability." 341 A.2d at 179 (citing W. Prosser, Law of Torts 542, 544 (1971)).  Whether a plaintiff may bring a claim against the original tortfeasor is separate from the issue of contractual indemnity by the successor corporation:  "The cause of action owned by the plaintiff is distinct from the cause of action arising out of the duty of the additional [successor corporation] to indemnify the [predecessor corporation]." *Id.*

The Ninth Circuit arrived at a similar conclusion:  "We are aware of no rule of law which allows a corporate entity to evade liability for its tortious conduct merely by selling the instrumentality which is alleged to have caused the injury." *Gee v. Tenneco, Inc.*, 615 F.2d 857, 862 (9th Cir. 1980).  And the Eighth Circuit cited *Gee* favorably, in a case applying Missouri law to find that a corporation's asset transfer did not relieve the transferor of liability. *Brown v. E.W. Bliss Co.*, 818 F.2d 1405, 1410 (8th Cir. 1987).

Terex cites *Tretter v. Rapid American Corp.*, contending that Continental did not discharge its tort liability to Jaycox by entering into the APA.  514 F. Supp. at 1346–47 (applying Missouri law).  In *Tretter*, the defendant moved for summary judgment, claiming that it could not be liable for the plaintiff's asbestos-related tort claims because the defendant had assigned those liabilities to a newly-formed subsidiary:  "[Defendant] argues that it can not now be held liable for the liabilities of Old Carey, since those liabilities were transferred to [a subsidiary, New Carey] . . . The Court can not accept that position."  514 F. Supp. at 1346.  The *Tretter* court denied summary judgment, declaring that "[t]he transferor can not escape liability

to a third party by assigning the liability to the transferee" and holding that the "transfer of this liability to [the subsidiary] does not bar this suit." *Id.* at 1347 (citing *Gee*, 615 F.2d at 862).

*Tretter* analyzed *Trimper v. Harris Corporation*, 441 F. Supp. 346 (E.D. Mich. 1977), which previously found that a corporation that sold its assets to a successor was still liable for the tort liability, in addition to the successor. *Tretter*, 514 F. Supp. at 1346–47. In *Harris Corporation*, the manufacturer of a defective product, Sheridan Manufacturing Co., sold all of its assets to Harris Corporation. 441 F. Supp. at 346–47. Harris then turned around and sold those assets to Bruno-Sherman Corporation, but Harris continued to operate other businesses. *Id.* An injured plaintiff brought suit against Bruno-Sherman, and the court held that Bruno-Sherman was a successor to Sheridan's liabilities as a "continuation of the original manufacturing enterprise." *Trimper v. Bruno-Sherman Corp.*, 436 F. Supp. 349 (E.D. Mich. 1977). The same plaintiff then sued Harris, and the court held that Harris could not escape liability through the transfer of assets to a successor, Bruno-Sherman. *Harris Corp.*, 441 F. Supp. at 347 ("It is not the injured party's concern as to how that liability, if he wins his suit, will be allocated or borne as between them.").

Continental argues that *Tretter* involved a defendant who initially obtained the tort liability through a merger, while Continental manufactured the grinder that caused Jaycox's injury. Doc. 105 at 4–5. But that is beside the point, as Continental cannot absolve itself of liability simply by transferring it to a different entity by contract. *See Tretter*, 514 F. Supp. at 1346–47. Continental also urges that unlike the defendant in *Tretter*, Continental did not transfer its liability to a subsidiary, but Continental does not cite any authority to support its position that a contractual transfer of tort liability would absolve Continental of liability to Jaycox. Doc. 105 at 4–5. Continental's transfer of liability has the same legal effect as the defendant's in *Tretter*. 514 F. Supp. at 1347. Continental cannot escape its tort liability to Jaycox by assigning its assets

and liabilities to Terex USA.  *See id.* at 1346–47.  The Court finds that Continental retains liability for Jaycox's tort claims as a matter of law.

## V.      Conclusion

The language of the APA is clear and unambiguous:  Terex USA assumed liability for all future assertions of claims for product liability and warranty rather than future incidents giving rise to such claims.  Doc. 93-1 at 5.  Because Jaycox filed suit after the APA's closing date, this was a "future occurrence of product liability . . . claims," so Terex USA assumed the liability for his claims.  Continental did not eliminate its own tort liability by transferring its assets and liabilities to Terex USA, however, so it remains liable for Jaycox's claims.

Accordingly, the Court grants Jaycox's motion for partial summary judgment [79].  The Court grants in part and denies in part Continental's motion for summary judgment [71] and denies Terex's motion for summary judgment [76].

So Ordered this 28th day of May 2021.

_____
**STEPHEN R. CLARK**
**UNITED STATES DISTRICT JUDGE**